**NORFOLK AND WESTERN RAILWAY COMPANY, a corporation, Plaintiff,**

v.

**PERMANEER INCORPORATED, a corporation, Defendant.**

**No. 69 C 4(3).**

United States District Court,
E. D. Missouri, E. D.

Oct. 15, 1970.

**750**

Albert E. Schoenbeck, Schoenbeck & LaTourette, St. Louis, Mo., for plaintiff.

Martin M. Green, Green & Lander, Clayton, Mo., for defendant.

## MEMORANDUM OPINION AND ORDER

REGAN, District Judge.

Norfolk and Western Railway Company, a common carrier by railroad, brought this action to recover freight charges aggregating in excess of $180,-000 on shipments of 181 carloads of commodities made during the years 1966, 1967 and 1968 by the Wrightson Division of Permaneer Corporation. During the course of the trial, Permaneer conceded that as to 12 of the shipments it was indebted to Norfolk and Western in the sum of $6,748.87, the amount claimed with respect thereto. The issue as to the remaining 169 shipments is whether in preparing the bills of lading Permaneer correctly described the commodities shipped and applied the correct rate under applicable tariffs.

Tariff 17515–G sets forth local rules and charges governing transit privileges on lumber and other forest products in carload lots. The obvious purpose of transit privileges is to enable a shipper to obtain the benefit of a through rate on a commodity from point of origin to ultimate destination, even though there is a disruption in the movement of the shipment, the rate charged being that applicable to the outbound commodity in the form it leaves the transit station.

In 1964, Permaneer began utilizing its vinyl laminating process on various wood products at its plant located at Wright City, Missouri. After discussions between representatives of Permaneer and the railroad, Supplement 4 to Tariff 17515–G was issued November 20, 1964, effective December 23, 1964, granting certain transit privileges with respect to shipments of lumber (boards and sheets) originating at Crossett, Arkansas. Supplement 5 to the Tariff, which was issued June 17, 1965, effective July 19, 1965, added "plywood, boards and sheets" originating on the West Coast to the products entitled to

the transit privilege.[1] These supplements authorize shipments of the designated products to be stopped in transit at Wright City for the privilege of "facing or finishing with decorative or protective covering" and subsequently reforwarded to stations beyond the transit point at rates authorized in Item 170[2] plus a transit charge of 5 cents per 100 pounds. As a result of these supplements, defendant was enabled to unload shipments of flakewood and plywood (boards and sheets) at Wright City, apply its final laminating process, and then reship the improved product at the applicable through rate plus the transit charge.

Subsequently, Permaneer began the manufacture, at its Wright City plant, of the component parts of various articles of furniture (such as bookcases, record cabinets and storage cabinets) made of the vinyl laminated boards and sheets. However, none of these articles were assembled by defendant, the major portion of the manufacturing process being to bore, cut, groove and fit the boards and sheets. Permaneer then individually packaged all the component parts of each article including (in addition to the "manufactured" boards and sheets) all necessary hardware, a plastic edging, and a metallic resting glide (and in a relatively few instances, glass) together with printed instructions for assembly by the ultimate consumer.

On July 21, 1966, Supplement 7 to Tariff 17515–G, effective August 25, 1966, was issued at Permaneer's instance, granting the additional transit privilege of "manufacturing" with respect to all its shipments of plywood, boards or sheets which were stopped in transit at Wright City. The privilege of "manufacturing" permitted defendant to drill, bevel, groove, mould and otherwise process the vinyl coated boards and sheets at Wright City, and still to take advantage of the through rate for boards and sheets.

The railroad makes no contention that any of the work done by Permaneer *on the boards and sheets* at Wright City was not within the privilege of "manufacturing". The basic controverted question is whether defendant exceeded the transit privilege of "manufacturing," thereby making inapplicable the "boards and sheets" rates and requiring the application of a furniture rate. As we have indicated, what was shipped by Permaneer were sealed cardboard cartons each of which contained all of the component parts and pieces of the article of furniture, some of the parts being of materials other than the boards and sheets, together with printed instructions for assembling the parts and pieces.

It is at once apparent that unless the description "boards and sheets" is defined in an applicable tariff to cover the articles admittedly shipped, the description "furniture, knocked down flat" in another but higher tariff rate is more apt. That the articles shipped precisely fit the description "furniture, knocked down flat", is not seriously disputed by defendant. In truth, shipments made prior to the grant of the transit priv-

1. A subsidiary contention of plaintiff is that the comma between plywood and boards and sheets has no meaning. On the other hand, defendant contends that the words "boards and sheets" include lumber products other than plywood. In our judgment, the clear intent of Supplement 5 was to grant the transit privilege not only to plywood but also to boards and sheets made of ground wood as well. This is confirmed by a letter dated September 28, 1965, written to defendant on behalf of plaintiff. In this letter it is specifically stated, "As to the use of the rates in conjunction with the description, lumber, viz.: plywood, boards or sheets, contained in Item 380 Series, of our transit Tariff 17515–G, the rate and transit application can be utilized in every instance where the heading for the commodity description of the rate tariff is *lumber* and the sub-description are boards, etc., *regardless of the material used in the make-up of the plywood, boards or sheets.*"

2. This item, contained in Transit Tariff 17515–G, specifies the method of determining and computing the transit rates. It is not in issue here.

ilege of "manufacturing" were described by defendant in the bills of lading and paid for as furniture. Moreover, the articles were sold by defendant to various retail stores and discount establishments as furniture (bookcases, storage cabinets and record cabinets) and in turn the stores sold the items to the public as "furniture," to be assembled by the ultimate consumer.[3] The sealed cardboard boxes containing the articles were imprinted with words such as "furniture", "bookcase", "storage cabinet", and other similar designations. This was done at the insistence of Permaneer's customers in order to make the article more saleable.

Defendant contends with respect to the eastbound shipments that Item 5795 of Tariff 2–F (and other comparable tariffs) applies and, considered together with the transit privileges, authorizes the lower "boards and sheets" rate. Item 5795 is applicable to "Board or Sheets, sawdust, ground wood, ground wood and ground bark mixed, or wood shavings, with or without added resin content not exceeding 10 per cent by weight, compressed, preservatively treated or not treated but not plasticized, veneered or not veneered, laminated or not laminated, edges glued or not glued together, flat, cut or not cut to dimensions and/or shaped but not assembled, grooved or indented or not grooved or indented, bored or not bored, edges plain or beveled, grooved, moulded, slotted or tongued (Subject to Notes 1, 3, 9 and 12)". In circumstances under which this Item applies, Note 12 permits the inclusion in the carload shipments of "nails or fasteners" not to exceed 5 per cent of the total weight. That the weight of such hardware is less than 5 per cent of the gross weight of each shipment is not in dispute.

As to the westbound shipments, defendant seeks to apply Item 7670 of Tariff 1–P. This Item, although otherwise comparable to Item 5795 of the eastbound tariff, contains no provision authorizing the inclusion of hardware in the shipment. We do not agree with defendant's interpretation that simply because of the relatively "insignificant" weight of the hardware in comparison to the total weight of the shipment, this tariff Item should be construed to permit the inclusion of the hardware. We may not amend the tariff under the guise of construction.

However, without regard to whether the hardware ("nails or fasteners") could for purposes of the boards and sheets rate, be included in the westbound shipments as well as in those eastbound, it is our view that nothing in either tariff authorized the inclusion of the plastic strips and metallic resting glides, or for that matter the printed assembly instructions. Granted that these articles constitute a very small portion of the total weight of each shipment, the fact remains that by including them in the same shipment the end product is "furniture, knocked down flat", whereas without such articles in the shipment, certainly so as those which were eastbound, they could meet the description "boards and sheets" in Items 5795 and 7670, with respect to which the transit privilege of "manufacturing" could apply.

In view of the fact that each carton shipped by Permaneer contained all the parts or pieces which collectively constitute bookcases or other similar furniture, we find persuasive Rule 20 of the Uniform Freight Classification (ICC No. 5) as to the proper classification of the commodity. This Rule provides: "Parts or pieces constituting one complete article, received as one shipment, on one bill of lading, will be charged the rating or rate provided for a complete article."

3. In addition, of the twelve shipments with respect to which Permaneer now admits liability, six involve claims based on the application of the furniture rate. These shipments were in all respects identical to the other 169 which it contests, defendant's admission of liability being based solely on the fact that the six shipments had been made prior to the effective date of Supplement 7.

We have considered, but reject, Permaneer's theory that Rule 20 is ambiguous and that in any event it could not apply because rate Items 5795 and 7670 both contemplate that the articles, as shipped unassembled, are complete. The fallacy of the latter contention is that the "assembled" complete articles referred to in these Items are not the kind of complete articles which Permaneer actually shipped. Whatever complete, but unassembled, articles were contemplated by Items 5795 and 7670, could only be articles containing no parts or pieces other than the processed boards and sheets (except nails and fasteners as to eastbound shipments). Here, the shipper included in each shipment, in addition to the boards and sheets, other parts and pieces of furniture which neither Transcontinental Tariff Item nor the Transit privilege authorized, pieces or parts which, together with the vinyl laminated and "manufactured" boards and sheets constituted a complete article of furniture, unassembled, so that in our judgment the necessary shipping charges must be based upon the rating and rate provided for such complete article. It is not without significance that when the true nature of Permaneer's shipments came to light, in connection with a damage claim made by a consignee of an eastbound shipment, Permaneer thereafter paid the railroad the additional freight charges for that shipment based upon the applicable furniture rate.

■ Permaneer takes the position that it would be unjust to require it to pay at the furniture rate. It contends that factors considered by the railroad in promulgating the transit privilege of "manufacturing" included the high density as well as the low susceptibility to damage of the commodities being shipped by Permaneer, as well as the shipping costs to Permaneer in utilizing railroad facilities as compared to those of other means of shipment. In this connection it argues that the railroad was fully aware of the nature of its products both before and after Supplement 7 to the Transit Tariff was promulgated, so that the parties intended the "manufacturing" privilege to comprehend what was actually done by Permaneer and that the privilege should be construed to effectuate that intention. Our view of the credible evidence does not support the contention that the carrier was in fact fully aware either of all that was contained in the cartons or of the scope of the privilege which Permaneer now contends was intended to be granted. We note that although requests were made from time to time on behalf of the railroad for copies of the sales catalog which would have accurately described the articles sold and shipped by Permaneer, none was ever furnished.

■■ There is no dispute about the fact that plaintiff as a common carrier must charge, and that defendant as shipper must pay, the rates established by the tariffs and made applicable by the classifications approved by the Interstate Commerce Commission. Discrimination and undue preference as between shippers of commodities are prohibited by law whether by direct action or by abuse of Transit Tariff privileges. Granted that the high density and low susceptibility to damage of the commodities shipped by Permaneer might conceivably have warranted a lesser rate, that is a matter solely within the competence of the Interstate Commerce Commission. We may not make exceptions not warranted by the proper construction of the tariffs. The only privileges granted defendant by the Supplements to the Transit Tariff were to "vinyl laminate" and then "manufacture" boards and sheets. The metallic resting glides and plastic edgings as well as the printed instructions for assembling were not part of the "manufacturing" process and were not within the privileges granted. So, too, the shipment of glass was not authorized by the transit privileges. By the inclusion of these parts and pieces, as well as the hardware items in westbound shipments, Permaneer exceeded the transit privileges, with the end result that the commodity

shipped in each instance was "furniture, knocked down flat." Defendant erroneously misdescribed or misclassified the commodities in the bills of lading it prepared as "boards and sheets".

There is no dispute in the evidence that if the classification of the commodities is that of "furniture, knocked down flat," the undercharges aggregate the sum of $179,583, and it is admitted that in addition thereto defendant owes plaintiff, primarily because of a difference in weights and rates in six shipments, the sum of $556.74. Accordingly, we find plaintiff is entitled to judgment in the sum of $180,139.74.

The Clerk is directed to enter judgment in favor of plaintiff and against defendant in said sum of $180,139.74, together with costs. The foregoing memorandum constitutes our findings of fact and conclusions of law.